**MEAD DATA CENTRAL, INC.,**
Appellant,

v.

**UNITED STATES DEPARTMENT OF the AIR FORCE et al.**

No. 76–2134.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 4, 1978.
Decided April 3, 1978.

See also, 184 U.S.App.D.C. ——, 566 F.2d 242.

——————

Robert N. Sayler, Washington, D. C., with whom Joanne B. Grossman, Washington, D. C., was on the brief for appellant.

Eloise E. Davies, Atty., Dept. of Justice, Washington, D. C., for appellees. Barbara Allen Babcock, Asst. Atty. Gen., and Leonard Schaitman and Michael H. Stein, Attys., Dept. of Justice, and Earl J. Silbert, U. S. Atty., Washington, D. C., were on the brief for appellees.

Before BAZELON, McGOWAN and MacKINNON, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM.

Mead Data Central, Inc. (MDC) markets a computerized system for retrieving legal data. In February 1975, MDC submitted an unsolicited proposal to the Air Force recommending that the MDC system be substituted for a competitor's system already in use by it. Some time in late August or September of that year—the record indicates only that it was between August 29 and September 22—the Air Force rejected MDC's proposal.

Since that time, MDC has vigorously sought access under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to the Air Force documents that reflect its course of negotiation with MDC's competitor as well as its consideration and rejection of MDC's February 1975 proposal. MDC's efforts have been partially successful, due both to the Air Force's voluntary compliance with some of MDC's FOIA requests, and to an earlier decision of a panel of this court involving a separate request. *Mead Data Central, Inc. v. United States Department of Air Force (MDC–I),* 184 U.S.App. D.C. 350, 566 F.2d 242 (1977).

In its request involved in the present case, MDC seeks disclosure of Air Force documents reflecting the agency's evaluation and response to MDC's proposal. The Air Force complied with much of MDC's request in its initial response and further upon MDC's appeal within the agency.[1]

1. Initially, the Air Force refused to disclose the following information, citing Exemption 5. The acronym "FLITE" refers to the legal data retrieval system already in use by the Air Force at the time MDC proposed the substitution of its system:

    a. An Optional Form 41 dated 22 August 1975 signed by D. Harter, Air Force Electronic Systems Division (ESD) project officer for the FLITE-Mead Data Central comparison containing a request for, and subsequent internal Air Force comments made by other ESD personnel on a proposed response to Mead Data Central's 2 June 1975 proposal.

    b. A coordination copy of a letter dated 29 August 1975, subject: "FLITE Unsolicited Proposal, Mead Data Central, 17 Feb 75" signed by Robert L. Kopf, Deputy Chief, ADSP Management Division, Directorate of Data Automation to ESD/MCS regarding a proposed response to Mead Data Central (which proposed response is attached to the document). The coordination copy also contains a memo for record which discusses the cost study, the items compared therein and suggests possible responses to be made by Mead Data Central (MDC).

    c. A letter dated 13 August 1975 subject: "FLITE Unsolicited Proposal, Mead Data Central, 17 Feb 75" signed by Lt. Col. Arnold I. Persky, Chief, Executive Services, Office of The Judge Advocate General to AF/ACDC transmitting a letter dated 12 August 1975 from AF/JAESL (FLITE) to HQ USAF/JAES subject: "FLITE Unsolicited Proposal, Mead Data Central 17 Feb 1975." The letter from FLITE to AF/JAES preliminarily discusses assumptions made by MDC as to FLITE operations; FLITE operations; FLITE experiences with batch versus terminal search operations; FLITE's assessment of problems associated with limited access to data bases; the FLITE-JURIS relationship; an assessment of staff changes possible under the MDC unsolicited proposal; a discussion of comments in the AF/PRMM letter of 25 July 1975, and areas not discussed in the AF/PRMM letter involving possible additional cost factors.

    d. A 19 July 1975 AF/PRMM letter on the MDC unsolicited proposal to AF/ACDC and the 31 July 1975 letter of AF/ACDC transmitting the 25 July 1975 AF/PRMM letter to AF/JAES. The 25 July PRMM letter discusses and comments upon a previously completed cost comparison study of the MDC unsolicited proposal for FLITE. It suggests possible changes in the study.

    e. A 19 July 1975 letter signed by Col. Robert M. Mebane, Chief ADPS Management Division, Director of Data Automation to AF/JAES regarding the MDC unsolicited FLITE proposal. The letter requests additional comments on the MDC alternate proposal to store on line, at any one time, 20 percent of the "private" data base unique to the FLITE operation.

    f. An analysis and evaluation of the MDC unsolicited proposal prepared by the MCS section of the Electronic Systems Division (AFSC) dated 13 June 1975 and transmitted over the signature of Col. Robert J. Latina, Director of ADPE Selection, Deputy for Command and Management Systems, to USAF/ACDC. The document considers the associated costs of accomplishing certain functions of the FLITE operation by Mead Data Central versus continued accomplishment of these functions on an in-service basis.

The District Court, after *in camera* inspection, ordered additional disclosures of parts of two of the withheld items, but largely upheld the Air Force's claim that all or portions of eight documents fit within the policy-deliberative part of Exemption 5, 5 U.S.C. 552(b)(5). We affirm.

We agree with appellant that factual material cannot be exempt under Exemption 5, *EPA v. Mink,* 410 U.S. 73, 93, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), so long as it does not "expose the deliberative process." *MDC–I, supra,* 184 U.S.App.D.C. at 364, 566 F.2d at 256. We agree with respondent and the District Court, however, that the material withheld in this case—mainly cost comparisons, feasibility opinions, and the data relevant to how the personnel involved arrived at those comparisons and opinions—are policy deliberative.

g. An 11-page internal Air Force document containing FLITE item by item comments on the MDC unsolicited proposal, including comments as to data bases, costs and comparative convenience and acceptability of the systems' usage.

h. Letter 28 March 1975, subject: FLITE, Unsolicited Proposal Mead Data Central from AF/JAESL to AFAFC/AD, AF/ACDC from Lt. Colonel Rose Volino, Chief FLITE. The letter comments on certain portions of Mead Data Central's unsolicited proposal thereof vis-a-vis FLITE; Mead Data Central's protest of award, offers assistance in evaluation, etc., and forwards eight attachments two of which were not used in the evaluation (1970 analyses of MDC and Aspen Systems). The other attachments were furnished by AE/DADF per your request.

Upon appeal within the Agency, the following "Index of [Previously] Withheld . . . Documents for Release Upon Appeal" was prepared, listing also the documents or portions thereof that the Agency continued to withhold:

1. The handwritten optional Form 41 dated 22 August 1975 as described in paragraph a. of the initial denial letter is withheld pursuant to 5 U.S.C. § 552(b)(5).

2. Factual portions of a coordination copy of a 29 August 1975 letter described in paragraph b. of the initial denial letter. The edited portions comment on the necessity for further action, conclusions on the Mead Data Control [*sic*] (MDC) proposal, recommendations on alternatives that might have been used, and possible responses MDC might make to a proposed response letter which was attached. The deleted portions are exempted under 5 U.S.C. 552(b)(5).

3. The transmittal letter of 13 August 1975 referenced in paragraph c. of the initial denial letter and the factual portions of the attached letter. The edited portions include opinions about assumptions made in the 25 July 1975 letter referenced in the next paragraph below, FLITE personnel's opinions about the proposed MDC system, and predictions of possible trouble areas in the proposed system.

4. The 25 July 1975 AF/PRMM letter referenced in the initial denial letter in paragraph d., without the 31 July 1975 transmittal letter which is withheld pursuant to 5 U.S.C. 552(b)(5). The edited portions address possible changes in the feasibility study and suggest possible deadlines and ask for evaluation of several parts of the 25 July 1975 letter.

5. The 19 June 1975 letter referenced in paragraph e. of the denial letter as 19 July 1975. The deleted portions refer to the conclusions of the feasibility study, recommendations with respect to several aspects of the study, and the opinions of FLITE personnel. The page attached to the letter is from the feasibility study.

6. The feasibility study referenced in paragraph f. of the denial letter with a 13 June 1975 cover letter. The edited portion of the transmittal letter states the study's conclusion. The provided study is complete until the page headed "FLITE Assumptions and Ground Rules." The deleted portions mention assumptions made in furtherance of the study. The "Ground Rules" are released as these reflect the basis of the MDC proposal.

The cost comparison is deleted in its entirety as it consists of the conclusions of Air Force personnel which are based on the assumptions of the study. This involves one page and one table of comparison.

The portions of the "Results of Analysis" which have been deleted reflect the conclusions of the study and specifically the estimated costs to the governments.

The seventeen pages following the cover page "Line Item Remarks" have been deleted as these are entirely conclusional.

The rest of the study is entirely disclosed as it represents Air Force correspondence with MDC.

7. The 11-page internal document referenced in paragraph g. of the denial letter. The excised portions are strictly opinions of Air Force personnel on the referenced items they follow.

8. The 28 March 1975 letter referenced in paragraph h. of the denial letter. The deleted portions are predictions of future Air Force action, opinions about the assumption to be used with respect to the feasibility study, and opinions as to the date of completion of the study.

They are not raw facts with informational value in their own right, but instead serve primarily to reveal the "evaluative" process by which different members of the decision-making chain arrived at their conclusions—and what those predecisional conclusions are. *Washington Research Project, Inc. v. HEW,* 164 U.S.App.D.C. 169, 181, 504 F.2d 238, 250 (1974). In addition, the cost comparisons and feasibility opinions are directed at a very specific decision, *i. e.,* whether or not to accept MDC's proposal. *See MDC–I, supra,* 184 U.S.App.D.C. at 365, 566 F.2d at 257; *Washington Research, supra; compare Vaughn v. Rosen,* 173 U.S.App. D.C. 187, 194–98, 523 F.2d 1136, 1143–47 (1976). While MDC correctly notes that the end product of these Air Force deliberations on the MDC proposal is not a "broad policy" decision, that deliberation is nonetheless a type of decisional process that Exemption 5 seeks to protect from undue public exposure. *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150–51, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); S.Rep. 813, 89th Cong., 1st Sess. 9 (1965).

In sum we are in agreement with the District Court that *Washington Research* controls the present case. The former decision's reading of Exemption 5 to cover evaluative summaries of, and site visit reports on, mental health grant applications requires a similar result under the circumstances before us, involving the Air Force's evaluation of MDC's "application" for a contract to furnish the Service's legal data retrieval system. We find MDC's attempts to distinguish *Washington Research* —including by reference to *Vaughn, supra* — unpersuasive. In both cases, the "basic factual data was available" to the requester, *Vaughn, supra,* 173 U.S.App.D.C. at 198, 523 F.2d at 1147 n.38, leaving undisclosed only "evaluations [and comparisons] based on . . . the writer's own values." Appellant's Brief at 14.

We are also convinced that, between the appeals officer at the Air Force and the District Court, the necessary efforts were made to identify and disclose all "reasonably segregable" and purely factual material. The Air Force accordingly has complied with its own regulation, 32 C.F.R. § 806.25 (1976), as well as with FOIA. Thus, the Air Force official involved at the agency's appellate level averred in his affidavit that he attempted to disclose "[a]ll reasonably segregable factual portions," Appendix (App.) at 12, and it seems clear from the materials he ordered provided to MDC (overruling his subordinate) that such an effort was made. He also showed an awareness of the rule that factual material may be withheld only if it was inseparable, without distortion, from the underlying policy deliberation. App. 14–15.

Moreover, in reviewing that official's determinations, the District Court, following its own viewing of the documents, ordered disclosure of two minor " 'factual' and 'narrative' " portions. App. at 19, *quoting Washington Research, supra,* 164 U.S.App. D.C. at 181–82, 504 F.2d at 250–51. This last suggests both that Air Force officials exercised reasonably sound judgment in drawing their conclusions as to the exempt nature of the documents, and that the District Court carefully reviewed those administrative conclusions for consistency with the appropriate legal standard.

Finally, appellant's complaints about the alleged brevity and conclusional format of the Air Force's description of the undisclosed materials and of its segregability claims lose much of their force because the District Court, after *in camera* inspection, accepted appellant's own description of the documents. It simply disagreed with appellant's legal conclusion as to the nonexempt nature of the materials thus described. App. at 19. We therefore do not have a situation in which the basic contents of the documents are in dispute. Instead, we are confronted primarily with legal questions which the District Court has answered correctly. *Compare MDC–I, supra,* 184 U.S. App.D.C. at 358, 566 F.2d at 250.

We also reject MDC's other major claims, emphasized in oral argument, that the withheld material, especially item 6, *see* note 1 *supra,* is thoroughly reflective of the reasons actually, finally, and self-consciously

relied on by the Air Force in rejecting the MDC proposal. If the withheld portions met this description, we agreed that they would embody the final decision itself and would have to be disclosed. *See NLRB v. Sears, Roebuck & Co., supra. See also* 32 C.F.R. § 806.23(e)(5) (1976). At best, however, MDC could only assert before us in argument that the conclusions and supporting cost comparison data in the item 6 feasibility study issued on June 13, 1975, *might* contain the Air Force's reasons for its August-September 1975 decision not to accept MDC's proposal.

Refuting this assertion by MDC is the Air Force's own characterization of the study as "an internal communication of opinion [that] is not a final agency decision." App. 15. The Air Force's description is supported by the fact that two and one-half to three and one-half months passed between the issuance of the item 6 study and the agency's decision. During that time, as the document descriptions make clear, the cost study itself was apparently analyzed and criticized by Air Force officials, and "additional cost factors" and "possible changes in the study" were discussed. *See* items 2, 3, 4; note 1 *supra.* Moreover, two other withheld documents apparently contain evaluations of MDC's proposal that are separate from the cost study in item 6. *See* items, 7, 8; note 1 *supra.*

■ There is accordingly no reason to believe—contrary to the Air Force's patently reasonable claim, which apparently was borne out by the District Court's *in camera* scrutiny—that (1) the conclusions of the cost study (or any of the other withheld items alone or together) embody or totally explain the decision to reject MDC proposal or (2) they were adopted by the Air Force as such, rather than simply used by it in reaching that decision. FOIA is not designed to force every government agency to produce a document explaining each of its decisions, nor is it designed to force the agency or courts to find and disclose whatever extant document comes closest to serving that decision-explaining role. *Renegotiation Board v. Grumman Aircraft,* 421 U.S.

168, 192, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). We consequently see no reason to scrutinize the material ourselves *in camera,* as MDC requests, and we instead stand behind the District Court's decision.

■ MDC's final argument is that the Air Force must under Exemption 5, but did not, demonstrate that withholding the material serves some compelling government interest. Under other circumstances, we might be inclined to hold that Exemption 5, like all of the others, involves a *congressional* decision that any material fitting therein—by virtue of that fact alone—serves a sufficiently important governmental interest to allow nondisclosure if the agency decides that it is in its interest to withhold it. *See MDC–I, supra,* 184 U.S.App.D.C. at 371, 566 F.2d at 263 n.1 (McGowan, J., dissenting). We need not reach that issue, however, because the District Court in this case found that disclosing the withheld material "would be 'injurious to the consultative functions of government that the privilege . . . protects.'" App. at 21, *quoting EPA v. Mink, supra,* 410 U.S. at 87, 93 S.Ct. 827 at 836. This finding, which we find substantially supported, is the very one that MDC claims is lacking, Appellant's Brief at 21, and it confirms the Air Force's own determination—satisfying 32 C.F.R. § 806.23 (1976), *see MDC–I, supra,* 184 U.S. App.D.C. at 366–67, 566 F.2d at 258–59— that "a significant governmental purpose would be served by withholding the documents . . . ." App. at 13. If government employees expected that every written recommendation, cost analysis, or feasibility opinion—as well as the criteria used in reaching the same—would be the object of intense scrutiny by the party adversely affected thereby, they would be likely only to communicate orally and/or conclusionally. The cost of such an eventuality in terms of efficiency and quality of decision-making could be great indeed.

For all of the foregoing reasons, we find that the government met its burden of proving that it has accurately described the withheld materials, and that those materi-

als fit within Exemption 5. The judgment of the District Court is, accordingly,

*Affirmed.*