In re **POLYPROPYLENE CARPET ANTITRUST LITIGATION.**

**MDL Docket No. 1075.**

United States District Court, N.D. Georgia, Rome Division.

July 29, 1998.

Randall Lee Allen, Teresa Thebaut Bonder, Alston & Bird, Tony Glen Powers, Rogers & Hardin, W. Pitts Carr, Carr Tabb & Pope, David R. Aufdenspring, Dean S. Daskal, Robert Moore Travis, John M. Gross, Glenn Johnson, Powell Goldstein Frazer & Murphy, Atlanta, GA, Robert Maddox Brinson, Brinson Askew Berry Siegler, et al., Rome, GA, Charles Conrow Murphy, Jr., Vaughan & Murphy, John Robert Fitzpatrick, Barbara Webb Cash, nam, U.S. Department of Justice, Antitrust Division, Atlanta, GA, Michael D. Hausfeld, phv, Cohen Milstein Hausfeld & Toll, Washington, DC, Edward Hine, Jr., Hine & Niedrach, Rome, GA, Michael Dockterman, phv, Wildman Harrold Allen & Dixon, Chicago, IL, Richard A. Lockridge, phv, Joseph Bruckner, phv, Lockridge Grindal Nauen & Holstein, Minneapolis, MN, Laurie Webb Daniel, Gregory J. Digel, Holland & Knight, Atlanta, GA, Leonard Barrack, phv, Steven A. Asher, phv, Barrack Rodos & Bacine, Philadelphia, PA, Gordon Ball, phv, Office of W. Gordon Ball, Knoxville, TN, Martin D. Chitwood, Craig Gordon Harley, Chitwood & Harley, J. Robert Williamson, Scroggins & Williamson, Atlanta, GA, Arthur N. Bailey, phv, Office of Arthur N. Bailey, Jamestown, NY, Jerome J. Froelich, McKenney & Froelich, Atlanta, GA, for Movants.

## ORDER

HAROLD L. MURPHY, District Judge.

This case is before the Court on Defendant Shaw Industries' Motion for Protective Order [177], Defendants Beaulieu of America and Conquest Carpet Mills' Motion for Protective Order [178], Defendant Shaw Industries' Motion for the Return of Documents [184], Defendant Beaulieu of America's Motion to Dismiss Plaintiffs' Complaint, for Protective Order, and for Disqualification of Counsel [186], Plaintiffs' Motion to Exceed Page Limitations [192], Plaintiffs' Motion to Exceed Page Limitations [198], and Defendant Beaulieu of America's Motion to Strike Declaration of Charles W. Wolfram [204].[1]

## I. Background

In 1995, the Department of Justice's Antitrust Division (the "Division") conducted an investigation of alleged antitrust violations by carpet manufacturers. A grand jury was convened (the "Antitrust Grand Jury"), which continued the investigation and returned two indictments against Johnny A. West and Sunrise Carpet Industries, Inc. *United States v. Johnny A. West,* No. 1:95–CR–240 (N.D.Ga.1995); *United States v. Sunrise Carpet Indus., Inc.,* No. 1:95–CR–214 (N.D.Ga.1995).

During its investigation, the Antitrust Grand Jury subpoenaed numerous documents from several carpet manufacturers, including Defendants Shaw Industries, Inc., and Mohawk Industries, Inc. Defendant Shaw in particular turned over more than 1,300 boxes of documents to the Division in response to Antitrust Grand Jury subpoenas. As the investigation progressed, the Division returned approximately 600 boxes of documents to Shaw.

In October 1997, after the Antitrust Grand Jury completed its investigation, the Division returned another 700 boxes of documents (totaling more than one million pages) to Defendant Shaw and began processing the remaining documents to be returned to other carpet companies. (Mem. of the United States in Supp. of Def. Shaw's Mot. for Protective Order at 1; Def. Shaw's Br. in Supp.

of Mot. for Return of Documents at 1.) According to briefs filed by the Division, Division officials instructed paralegals to review the boxes of documents and determine where the boxes should be sent. (Mem. of the United States in Supp. of Def. Shaw's Mot. for Protective Order at 22.)

On November 17, 1997, Plaintiffs served a subpoena upon the Division seeking copies of all documents produced to the Division by Defendants, including all documents produced pursuant to the Antitrust Grand Jury subpoenas. (Mem. of the United States in Supp. of Def. Shaw's Mot. for Protective Order Ex. A.) The Division objected to Plaintiff's subpoena on several grounds, including an argument that documents related to the Antitrust Grand Jury investigation are protected from disclosure by Federal Rule of Criminal Procedure 6(e). (*Id.* Ex. B.) Defendants eventually agreed to produce to Plaintiffs copies of any documents they provided to the Division, and no further actions have been taken with respect to Plaintiffs' subpoena. (Order of Dec. 17, 1997; Order of March 19, 1998.)

On or about November 21, 1997, Defendant Shaw's counsel returned to the Division a small "banker's box" that contained approximately ten and one-half inches of "a variety of [the Division's] internal files." (United States' *In Camera* Resp. to Court Order, at 2.) Defendant Shaw found the Division's internal files among the boxes of documents returned to Defendant Shaw by the Division. (*Id.*)

On or about December 15, 1997, Randall Allen, Defendant Mohawk's counsel, notified the Division by telephone that the Division also had included a "small number" of its internal documents among the documents returned to Defendant Mohawk. (United States' *In Camera* Resp. to Court Order at 1–2.) The documents included printouts of e-mail messages about subpoenaed documents and indices of the e-mail messages. (*Id.*) After several unsuccessful attempts to return Allen's call, the Division attorney spoke with Allen on or about January 16, 1998. (*Id.*) Allen told the Division's attorney that he

---

**1.** The Court grants Plaintiffs' two Motions to Exceed Page Limitations.

would mail the documents to the Division, and the Division received the documents on or about January 20, 1998. (*Id.*)

In January 1998, Defendant Shaw made available to Plaintiffs the boxes of documents returned to Defendant Shaw by the Division. Defendant Shaw and its counsel had reviewed the documents in 1994 in conjunction with an unrelated litigation matter, and they had reviewed the documents once again in 1995 prior to producing the documents in conjunction with the Antitrust Grand Jury subpoenas. (Def. Shaw's Reply Br. in Supp. of Mot. for Return of Documents at 3.) Because of the volume of the documents, Defendant Shaw and its counsel did not review the documents again before making them available to Plaintiffs. (*Id.* at 3–4)

During Plaintiffs' inspection of Defendant Shaw's documents, Plaintiffs discovered one file box ("Box 108") that contained, along with original Shaw documents, documents generated by, or maintained by, the Division pursuant to the Antitrust Grand Jury's investigation of the carpet industry (the "DOJ Documents"). (Decl. of Joel I. Klein, Dated June 30, 1998, Exs. A & B.) Several of the documents also pertain to a new investigation of allegedly illegal activities in the carpet industry that presently are under investigation by another grand jury sitting in the Northern District of Georgia. Described broadly, the DOJ Documents can be separated into ten categories:

(a) internal Division memoranda concerning immunity to be given to witnesses who testified before the Antitrust Grand Jury, and related correspondence with the United States Attorney's Office;

(b) internal Division memoranda describing witness interviews, related correspondence, and documents obtained from witnesses;

(c) Antitrust Grand Jury subpoenas to witnesses and corporations, related correspondence, affidavits of compliance related to the subpoenas, and documents received in response to the subpoenas;

(d) internal Division memoranda describing meetings with criminal investigative agencies, and correspondence to and from the agencies;

(e) sealed court orders regarding immunity for witnesses before the Antitrust Grand Jury and other matters, and other filings under seal concerning investigative agents associated with the Antitrust Grand Jury;

(f) internal time lines and agendas of the investigation;

(g) miscellaneous correspondence between Division staff and third parties that concern the Antitrust Grand Jury investigation, including defense counsel in the *Sunrise* and *West* cases;

(h) court documents from cases that Division staff considered to be relevant to the Antitrust Grand Jury investigation;

(i) copies of unsealed court documents in the *Sunrise* and *West* cases; and

(j) documents generated by Defendant Shaw, and perhaps other carpet manufacturers as well, that pertain to the pricing of carpet and other business matters.

In January 1998, Plaintiffs selected the DOJ Documents for photocopying by Chattanooga Copies, LLC, an independent copying service. Following the standard procedure for all documents selected by Plaintiffs, the photocopying service made one copy of the DOJ Documents for Plaintiffs and one copy for Defendant Shaw. (Pls.' Mem. in Opp. to Mots. for Protective Orders at 4.) On January 22, 1998, Chattanooga Copies sent copies of the DOJ Documents in Box 108 to Plaintiffs via UPS. (Def. Shaw's Br. in Supp. of the Return of Documents Ex. B.) Although the record does not expressly indicate that a set of copies also was sent to Defendant Shaw at this time, the briefs filed by Defendant Shaw indicate that Defendant Shaw also received copies of the photocopied documents.

On February 27, 1998, Plaintiffs produced an 84–page list of documents that Plaintiffs identified as the documents upon which they would rely to prove their claims. Plaintiffs produced this list to supplement their response to Defendants' Interrogatories, which required Plaintiffs to identify the documents upon which they planned to rely in support of their claims. Plaintiffs did not include any of the DOJ Documents in this list.

Defendant Shaw did not review the photocopies of the documents selected for copying by Plaintiffs. (Def. Shaw's Reply Br. in Supp. of Mot. for Return of Documents at 4.) Instead, because of the voluminous number of documents, Defendant Shaw elected to rely solely upon Plaintiffs' responses to Defendants' Interrogatories asking Plaintiffs to identify documents that Plaintiffs believed would support their claims. (*Id.*)

On April 24, 1998, Plaintiffs' counsel marked one of the DOJ Documents as an exhibit ("Exhibit 1") during the deposition of Howard E. Johnson, who worked for Defendant Beaulieu of America, Inc., until November 1995. (Dep. of Howard E. Johnson at 5, 22.) Plaintiffs' counsel also provided a copy of Exhibit 1 to all defense counsel. (Pls.' Mem. in Opp. to Mots. for Protective Order at 5.) At the conclusion of the deposition, counsel for Defendant Shaw offered the following comment:

> Before we get off the record, I want to make one comment about Exhibit 1.... It obviously bears a Shaw Bates number. I wasn't involved in the document production. I don't know how we got this document. I suspect it was inadvertently given to us by the government. I'm sure they didn't intend for us to have it. And I suspect that it was inadvertently produced. And I don't want the fact that this document is out here in any way to indicate that Shaw is changing its argument with regard to the secrecy of grand jury proceedings.

(Johnson Dep. at 37.)

On April 30, 1998, counsel for Defendant Shaw wrote to the Division and announced that Plaintiffs possessed Exhibit 1, which appeared to belong to the Division. (Def. Shaw's Br. in Supp. of the Return of Documents at 2.) The letter observes that Defendant Shaw already had returned a "file folder of Justice Department memoranda" to the Division on one occasion. (*Id.* Ex. B.) The letter further observes that "[b]ecause of our discovery of that file we attempted to review the remaining files to ensure that they were free of internal Justice Department documents. Apparently we missed this particular document." (*Id.*) The letter concludes that

Defendant Shaw's counsel "cannot be sure (without a page by page review of some 700 boxes of documents) that other such documents were not also produced. You may wish to address that issue with the Plaintiffs whom we understand have a detailed database of the documents they copied." (*Id.*) The Division did not contact Defendant Shaw or Plaintiffs after receiving Defendant Shaw's letter.

Following the Johnson deposition, Defendant Shaw began reviewing the boxes returned to Defendant Shaw by the Division and the photocopies of the documents selected for copying by Plaintiffs. (Def. Shaw's Br. in Supp. of the Return of Documents at 3.) On May 29, 1998, Defendant Shaw's counsel learned that Defendant Shaw possessed Box 108 and confirmed that Plaintiffs had photocopied the DOJ Documents contained in Box 108. (*Id.*) On June 1, 1998, Defendant Shaw's counsel contacted the Division and explained that the DOJ Documents had been given to Defendant Shaw and subsequently photocopied by Plaintiffs. (Pls.' Mem. in Opp. to Mots. for Protective Orders Ex. F.) Defendant Shaw also requested that Plaintiffs return all DOJ documents in their possession and notify Defendant Shaw if Plaintiffs possessed any other documents belonging to the DOJ. (*Id.*) Defendant Shaw then delivered the original documents contained in Box 108 and the photocopies in its possession to the Division. (Def. Shaw's Br. in Supp. of Return of Documents at 3.)

On June 2, 1998, the Division requested by letter that Plaintiffs return all copies of the DOJ Documents to the Division. (Pls.' Mem. in Opp. to Mots. for Protective Orders Ex. G.)

On June 3, 1998, the Court held a telephone conference with the parties and counsel for the Division. The Court ordered Plaintiffs to provide the Division with a copy of all the DOJ Documents, and to deliver to the Court all originals and photocopies of the DOJ Documents in Plaintiffs' possession. The Court also ordered Plaintiffs to identify those attorneys who had reviewed the DOJ Documents, and directed the Division to prepare a list describing the DOJ Documents. Finally, the Court imposed an expedited

briefing schedule for addressing the issues raised by Plaintiffs' possession of the DOJ Documents.

On June 9, Plaintiffs delivered to the Court a list of all Plaintiffs' counsel who had access to the DOJ Documents. (Def. Mohawk's Mem. Addressing Inadvertent Disclosure Ex. K.) Plaintiffs divided the attorneys into two groups: Group A, which includes those attorneys who had access to a small number of the DOJ Documents selected for use in preparing for depositions, and Group B, which includes one hapless junior associate who performed the preliminary review of the DOJ Documents and other documents produced by Defendant Shaw. (Id.) In all, thirty-five attorneys at twenty-three law firms had access to the DOJ Documents. (Id.)

On June 16, 1998, the Court ordered the Division to file for *in camera* inspection copies of all correspondence, and summaries of all communications, concerning the production to any Defendant of any documents belonging to the DOJ. The Division complied with this request on June 22, 1998. Counsel for Defendants similarly have filed summaries of any correspondence they had with the Division regarding inadvertently produced documents.

The parties and the Division raise two primary issues in their briefs. First, although the DOJ Documents have been disclosed to Plaintiffs and Defendant Shaw, the Division seeks the return of the documents and a protective order safeguarding the confidentiality of the documents. Second, Defendants argue that, in light of the confidential nature of the DOJ Documents, Plaintiffs' retention and use of the Documents warrants the imposition of sanctions, including the disqualification of Plaintiffs' counsel and the dismissal of this case.

## II. Confidentiality of the DOJ Documents

The Division argues that the confidentiality of the DOJ Documents is protected by: (1) the law enforcement investigatory privilege; (2) the work product doctrine; (3) Federal Rule of Criminal Procedure 6(e); (4) the deliberative process privilege; and (5) bailment theory. Plaintiffs counter that the DOJ Documents do not fall within the scope of Rule 6(e)(2) or any of the privileges asserted by the Division, and that the Division waived any claims of confidentiality when it produced the DOJ Documents to Defendant Shaw and, ultimately, to Plaintiffs.

For the reasons set forth below, the Court concludes that the DOJ Documents are protected under the law enforcement investigatory privilege and that the Division has not waived this privilege by inadvertently producing the documents to Defendant Shaw and, ultimately, to Plaintiffs. The Court also concludes that, although the Division is not entitled to invoke the work product doctrine in this case, the confidentiality of the Division's work product is entitled to protection pursuant to Federal Rule of Civil Procedure 26(c). Finally, the Court offers brief observations regarding the Division's remaining arguments concerning confidentiality, so that the Court may assess thoroughly Defendants' arguments that Plaintiffs' counsel's retention of the documents violated ethical rules.

Before proceeding to the merits of these issues, the Court observes that a significant portion of the documents contained in Box 108 do not belong to the Division. These documents appear to be internal pricing memoranda and other internal business documents generated by Defendant Shaw and other carpet manufacturers. (Klein Decl. Ex. B, at 18–20.) The Division does not claim ownership of these documents or assert that the documents must remain confidential. Rather, the Division proposes that the documents should be returned to their rightful owners. The Court agrees that this course of action is the best one, and further observes that, once the documents are returned, they should be subjected to discovery by Plaintiffs in a manner consistent with the discovery rules.

### A. Law Enforcement Investigatory Privilege

■ The Division argues that the confidentiality of the DOJ documents must be protected pursuant to the law enforcement investigatory privilege. "The law enforcement investigative privilege is 'based primarily on the harm to law enforcement efforts

which might arise from public disclosure of ... investigatory files.'" *United States v. Winner*, 641 F.2d 825, 831 (10th Cir.1981) (quoting *Black v. Sheraton Corp. of America*, 564 F.2d 531, 541 (D.C.Cir.1977)). The purpose of the privilege "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise prevent interference in an investigation." *In re Department of Investigation*, 856 F.2d 481, 484 (2d Cir.1988); *see generally* 26A Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure: Evidence § 5681 (1992) (reviewing the policies underlying, and various permutations of, the law enforcement investigatory privilege).[2]

The law enforcement investigatory privilege is a judicially created privilege, and, to the Court's knowledge, the Eleventh Circuit has not formally recognized that the privilege exists. The Court's research reveals only one district court order in this circuit, *Barnette v. Folmar*, 151 F.R.D. 685 (M.D.Ala. 1993), that has applied the privilege. 151 F.R.D. at 689 (citing *Black v. Sheraton Corp. of America*, 564 F.2d 531, 545 (D.C.Cir. 1977)). Nonetheless, after reviewing the opinions of at least four other circuits that have adopted this privilege,[3] the Court concludes that the Eleventh Circuit would recognize the strong policy justifications underlying the privilege, at least as it pertains to the DOJ Documents at issue in this case.

### 1. Application of the Privilege to the DOJ Documents

■ To protect documents under the law enforcement investigatory privilege, the claimant must satisfy three requirements: (1) the head of the department having control over the documents must raise a formal claim of privilege; (2) the department head must assert the privilege based on his or her actual personal consideration of the documents; and (3) the claimant must make a detailed specification of the information for which the privilege is claimed, with an explanation why this information properly falls within the scope of the privilege. *Tuite v. Henry*, 98 F.3d 1411, 1417 (D.C.Cir.1996).

■ In support of its claim, the Division has adduced affidavits from Joel I. Klein, assistant attorney general for the Antitrust Division, and Justin Nicholson, a trial attorney with the Division's Atlanta Field Office. Klein has reviewed a "representative sample" of the documents that the Division claims are privileged, and his assertion of the privilege is based on his personal knowledge of the contents of the documents. (Klein Decl. ¶ 2; Decl. of Justin Nicholson ¶ 9.) Klein's assertions thus satisfy the first two requirements.

Klein further avers that the documents are part of an investigative file examining alleged criminal antitrust violations, and that several of the documents are related to a new investigation of alleged criminal conduct in the carpet industry. (Klein Decl. ¶ 7–8.) Klein states that, although the Division shared the DOJ Documents at issue here with the United States Attorney's Office pursuant to an Order issued by Judge Hunt, the Division otherwise closely guards the confidentiality of documents in its investigatory files in order to ensure the effectiveness of the investigation, to protect confidential witnesses, and to maintain the confidentiality of law enforcement techniques used in the case. (Supp. Klein Decl. ¶¶ 4–7.) Finally, in declarations filed with the Court *in camera*, Klein and Jeffrey L. Berhold, an assistant United States Attorney, provide a detailed specification of the information for which the privilege is claimed and explain why the informa-

---

2. The judicially-created deliberative process privilege is not coterminous with a similarly-worded exemption applied to FOIA requests. *E.g., Dellwood Farms, Inc. v. Cargill, Inc.*, (applying law enforcement investigatory privilege in context of discovery dispute); *see also* 8 Wright & Graham § 5681 (distinguishing FOIA exemption and law enforcement investigatory privilege as applied in discovery disputes).

3. *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir.1997); *In re Department of Investigation*, 856 F.2d 481, 484 (2d Cir.1988); *United States v. Winner*, 641 F.2d 825, 831 (10th Cir.1981); *Black v. Sheraton Corp. of America*, 564 F.2d 531, 545 (D.C.Cir.1977).

tion falls within the scope of the privilege. (Supp. Klein Decl. ¶¶ 10–16; Decl. of Jeffrey L. Berhold ¶¶ 7–28.) The Klein and Berhold Declarations thus satisfy the third requirement for invoking the law enforcement investigatory privilege.

After reviewing the Klein and Berhold Declarations, as well as reviewing the DOJ Documents themselves, the Court finds that the confidentiality of the documents is protected by the law enforcement investigatory privilege. The Court cannot provide a detailed explanation why the documents fall within the privilege without compromising the confidentiality of the documents themselves. It suffices to say that the DOJ Documents contain highly sensitive information regarding the investigation of antitrust violations and other unlawful behavior. Considered together, the DOJ Documents reveal a roadmap of the investigation and also shed considerable light upon the theories upon which potential prosecutions may be based. Finally, the DOJ Documents contain abundant references to confidential sources that are not amenable to redaction.

█ A finding that the documents fall within the scope of the law enforcement investigatory privilege does not end the Court's analysis, however. "The law enforcement investigatory privilege is not absolute. It can be overridden in appropriate cases by the need for the privileged materials." *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir.1997).

> The balancing of that need—the need of the litigant who is seeking privileged investigative materials—against the harm to the government if the privilege is lifted is a particularistic and judgmental task. It therefore is confided to the discretion of the district judge .... [cits.] It seems to us, however, and not only to us, that there ought to be a pretty strong presumption against lifting the privilege.

*Id.* The District of Columbia Circuit has assembled ten factors to be weighed by courts performing this balancing test: (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff's case. *Tuite,* 98 F.3d at 1417.

Here, the first two factors counsel against disclosure because the documents contain statements by witnesses who have risked various forms of retribution in order to provide information to the Government. The fourth factor also counsels against disclosure, because the materials contain both factual data and evaluative summaries compiled by the Division's legal staff. Finally, the fifth and sixth factors weigh heavily against disclosure, because the continued use of these documents by Plaintiffs in this litigation likely will result in the sharing of the documents at some time with Defendants, at least one of whom is a potential defendant in an ongoing criminal investigation.

Weighing in favor of disclosure are the eighth, ninth, and tenth factors. Plaintiffs have brought this suit in good faith, may have difficulty obtaining this information from other sources, and likely would find the information helpful to their case. The ninth factor, however, does not weigh heavily in favor of disclosure because no evidence suggests that Plaintiffs cannot obtain the factual information contained in the documents from alternative sources.[4] The tenth factor also

---

4. Plaintiffs argue that one witness has revealed a lack of candidness with respect to his recollec-

tions of events described in the DOJ Documents. Other witnesses who also have knowledge of

weighs only slightly in favor of disclosure, because Plaintiffs will have an abundance of documents, data, and sworn testimony from which to prove their case. The importance of the few DOJ Documents at issue here thus pales in comparison to the evidence Plaintiffs have amassed, and will continue to amass, which may support their claims.

In sum, the factors favoring disclosure are greatly outweighed by the factors favoring confidentiality. The public interest in non-disclosure therefore compels a finding that the DOJ Documents are protected under the law enforcement investigatory privilege.

### 2. Waiver

■ The Seventh Circuit has held that the law enforcement investigatory privilege "can be waived, and, once waived, is lost." *Dellwood*, 128 F.3d at 1126. One way to waive the privilege is to allow a third party to have access to the documents. *Id.* Here, the Division's release of the DOJ Documents to Shaw, and ultimately to Plaintiffs, resulted from the Division's inadvertence and mistake. Under such circumstances, the prevailing view in courts of this circuit—and other circuits as well—is that a waiver can be found only after performing a balancing test that assesses the Division's conduct in inadvertently releasing the information, the sensitivity of the information, and Plaintiffs' need for the information. *Briggs & Stratton Corp. v. Concrete Sales & Servs.*, 176 F.R.D. 695, 699–700 (M.D.Ga.1997); *Cf. Dellwood*, 128 F.3d at 1126 (in the context of inadvertent disclosure of information protected by the privilege, "[c]ourts are somewhat less likely to find waiver in such a case"); *but see Bellsouth Adver. & Publ'g Corp. v. American Business Lists, Inc.*, No. 1:90–CV–149–JEC, 1992 WL 338392, at *8 (N.D.Ga. Sept. 8, 1992) (holding that inadvertent disclosure of documents constitutes a *per se* waiver of the attorney-client privilege) (citing *In re Sealed*

*Case*, 877 F.2d 976, 980 (D.C.Cir.1989)) (unpublished). The Court adopts the balancing test set forth in *Briggs & Stratton*, which examines: (a) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (b) the number of inadvertent disclosures; (c) the extent of the disclosure; (d) the delay and measures taken to rectify the disclosures; and (e) whether the overriding interests of justice would be served by relieving a party of its error. *Briggs & Stratton*, 176 F.R.D. at 699–700.

### a. Reasonableness of the Precautions

When the Division began returning the documents obtained pursuant to the Antitrust Grand Jury subpoenas in the fall of 1997, the Division instructed paralegals to perform this task. Without a doubt, the Division could have used procedures that more effectively safeguarded the confidentiality of such sensitive documents. However, the Court is mindful of the fact that the Division faced a daunting task of returning more than one million pages contained in several thousand boxes. The use of paralegals by a government agency to sort through these documents is no less reasonable than the use of first-year associates by a private law firm to review voluminous files of documents, which the Court knows to be a common practice. Moreover, the Division first became aware that it had inadvertently released confidential documents in late November 1997, and thus had no notice at the time it began returning the subpoenaed documents that the Division's own documents had been intermingled with the subpoenaed documents. The Court therefore finds that, given the multitude of documents to be processed, the Division used reasonable precautions to safeguard the confidentiality of the documents.[5]

these events, however, may be more willing to share this information. Furthermore, Plaintiffs may be able to impeach this witness and other purportedly reluctant witnesses with documents and information obtained pursuant to normal discovery.

**5.** Although the Division's precautions were sufficient in a legal sense to avoid waiving a claim of privilege, the Court observes that it is an open question whether the Division's precautions were sufficient in a more general sense to protect the interests of confidential witnesses and the interests of law enforcement officers whose efforts may be compromised by such disclosures.

## b. Number of Disclosures

When returning the subpoenaed documents to Defendants Shaw, Mohawk, and other carpet manufacturers, the Division included its own internal documents on three separate occasions. This number is relatively minute when compared to the enormous number of documents that the Division processed at the time. The Court therefore finds that the Division's three mistakes, when processing thousands of boxes containing more than one million pages, are not sufficient to support a finding that the Division waived all privileges associated with the documents. *Briggs & Stratton*, 176 F.R.D. at 699 ("Where voluminous files and records are stored, such mistakes are apt to occur from time to time for any number of causes.").

## c. Extent of the Disclosure

Considering the three episodes of inadvertent disclosure together, the Division released an approximate total of one file box of confidential documents. Considered in light of the fact that the Division processed several thousand boxes of documents, the extent of the disclosure is minimal. This factor therefore supports a finding that the Division did not waive any privileges associated with the documents.

## d. Measures Taken to Rectify the Disclosures

The Division first learned for the first time in late November 1997 that it mistakenly had included its own internal documents among the boxes of documents returned to Defendant Shaw. In December 1997, the Division learned that the same mistake had occurred with respect to documents returned to Defendant Mohawk. On April 30, 1998, the Division learned that one of the Division's internal documents had been used by Plaintiffs in a deposition. In fact, counsel for Defendant Shaw suggested that the document may have been produced inadvertently by the Division itself and advised the Divi-

sion to contact Plaintiffs to ensure that no other documents had mistakenly fallen into their hands. Finally, on June 1, 1998, the Division learned about the inadvertent disclosure of Box 108 to Defendant Shaw. The next day, the Division formally requested return of the DOJ Documents.

Under these circumstances, the Division's actions to rectify the inadvertent disclosures can hardly be described as vigilant. In a best-case scenario, once the Division learned from Defendant Mohawk in December 1997 that the Division had inadvertently disclosed documents a second time, the Division should have contacted all the companies to whom it had returned subpoenaed documents. At the least, the Division should have taken immediate steps to rectify the inadvertent disclosures when it learned on April 30, 1998, that Plaintiffs had used a DOJ Document in a deposition. (*See* Def. Shaw's Br. in Supp. of Return of Documents Ex. B (April 30, 1998, letter to Division reminding Division that Defendant Shaw already returned inadvertently produced documents on one occasion and suggesting that Division contact Plaintiffs to inquire as to other potential disclosures).) Instead, the Division waited until June 2, 1998, to request formally the return of the DOJ Documents. The Court therefore finds that the Division's belated efforts to seek the return of the DOJ Documents weighs in favor of a finding that the Division waived its privileges associated with the documents.

## e. Overriding Interests of Justice

This final factor is, in the Court's view, the most important factor, especially in this case. Here, the Court is faced with the inadvertent disclosure of documents closely associated with a grand jury investigation.[6] For the many reasons pointed out in the parties' briefs, the secrecy of proceedings before the grand jury serves important policy interests. *See United States v. Sells Eng'g*, 463 U.S. 418, 424, 103 S.Ct. 3133, 77 L.Ed.2d 743

---

**6.** For the purposes of finding whether the Division waived the law enforcement investigatory privilege, the Court need not determine whether the DOJ Documents constitute "matters before the grand jury" as defined in Federal Rule of Criminal Procedure 6(e)(2). The Court simply finds that, given the fact that the DOJ Documents are closely associated with a grand jury investigation, the overriding interests of justice lead to a conclusion that the Division did not waive the law enforcement investigatory privilege with respect to these documents.

(1983). The interests of justice therefore compel the Court to preserve the sanctity of the grand jury proceedings even in the face of inadvertent disclosure of the information by the Division. Plaintiffs will have many opportunities to obtain the information contained in the documents through the course of ordinary discovery, and need not disturb the privacy of the grand jury proceedings. For these reasons, this factor weighs heavily against a finding that the Division waived its privileges associated with the DOJ Documents.

### f. Summary

In summary, the Court concludes that, under the circumstances presented by this case, the Division has not waived the protection of the law enforcement investigatory privilege as it pertains to the DOJ Documents. The DOJ Documents retain their confidentiality despite the fact that the Division inadvertently provided the DOJ Documents to Defendant Shaw, and, ultimately, to Plaintiffs. Because the DOJ Documents are privileged, Plaintiffs are not entitled to further access to the DOJ Documents.

### B. Work Product Doctrine

█ The Division next argues that the DOJ Documents are protected under the work product doctrine. Federal Rule of Civil Procedure 26(b)(3) provides qualified protection from discovery to "documents and tangible things ... prepared in anticipation of litigation or for trial" by or for a party, or by or for a party's representative. Fed.R.Civ.P. 26(b)(3); *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir.), *modified on other grounds*, 30 F.3d 1347 (1994); *Burlington Indus., Inc. v. Rossville Yarn, Inc.*, No. 4:95–CV–0401–HLM, 1997 WL 404319, at *2 (N.D. Ga. June 3, 1997) (unpublished).

By its very terms, Rule 26(b)(3) applies only to documents created by or for a *party*, or by or for a representative acting on behalf of a *party*. *In re California Pub. Util. Comm'n*, 892 F.2d 778, 780–81 (9th Cir.1989); *Go Medical Indus. Pty, Ltd. v. C.R. Bard, Inc.*, No. 1:93–CV–1538–HTW, 1995 WL 605802, at *2–3 (N.D.Ga. July 6, 1995) (un-

published). Thus, "[d]ocuments prepared by one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit." 8 Charles Alan Wright, Arthur R. Miller, & Richard R. Marcus, Federal Practice & Procedure: Civil § 2024, at 354–56 (2d ed.1994).

The Division argues that this interpretation of Rule 26(b)(3) is incorrect, relying primarily on two circuit court cases that apply the work product doctrine to documents created by a non-party to the litigation before the court. *National Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 985 (4th Cir.1992); *In re Sealed Case*, 856 F.2d 268, 273 (D.C.Cir.1988). To the extent that *National Union* actually holds as much, the holding was criticized by the district court on remand. *See Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co.*, 148 F.R.D. 552, 554 n. 2 (S.D.W.V.1993) (questioning the *sub silentio* holding of *National Union*). Moreover, the majority of courts to consider the issue expressly follow the reasoning set forth in *California Public Utilities*. *E.g., In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 924 (8th Cir. 1997) (White House attorneys could not assert work product doctrine to protect documents created for litigation involving Hillary Rodham Clinton), *cert. denied*, —— U.S. ——, 117 S.Ct. 2482, 138 L.Ed.2d 991 (1997); *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh*, No. 93–3084, 1994 WL 58999, at *4 (6th Cir. Feb. 25, 1994) (unpublished); *Doubleday v. Ruh*, 149 F.R.D. 601, 606 (E.D.Cal.1993). The Court therefore adopts the sound reasoning of these cases, and respectfully disagrees with the outcome of the D.C. Circuit's opinion in *Sealed Case*.

█ Although the documents do not fall under the literal protection afforded by Rule 23(b)(3), the third party who generated the documents is not powerless to seek protection from disclosure of sensitive and confidential information. Rule 26(c) provides that a court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or

undue burden or expense, including ... that the disclosure or discovery may not be had." Fed.R.Civ.P. 26(c)(1). As pointed out by Professors Wright, Miller, and Marcus:

> courts need not be constrained by a literal reading of Rule 26(b)(3) and can continue to arrive at sensible decisions on this narrow point. To the extent that Rule 26(b)(3), literally read, seems to give insufficient protection to material prepared in connection with some other litigation, the court can vindicate the purposes of the work-product rule by the issuance of a protective order under Rule 26(c).

Wright, Miller & Marcus, Federal Practice & Procedure: Civil § 2024, at 356.

Eleventh Circuit law permits courts to issue protective orders pursuant to Rule 26(c) if the movant establishes "good cause" and the court, after balancing the interests of those affected by the protective order, finds that the protective order serves the interests of justice. *McCarthy v. Barnett Bank of Polk County*, 876 F.2d 89, 91 (11th Cir.1989). For example, under appropriate circumstances a court may enter a protective order "[i]n order to preserve the confidentiality of sensitive materials." *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 355 (11th Cir. 1987).

Here, a large portion of the DOJ Documents would constitute attorney work product as defined by Rule 26(b)(3) if the Division was a party to this litigation. Following the sound advice of Professors Wright, Miller, and Marcus, the Court finds that the confidentiality of these documents is appropriate for protection pursuant to Rule 26(c). Consequently, to the extent the DOJ Documents were prepared in anticipation of litigation or for trial by or for the Division, or by or for the Division's representative, the documents must be returned to the Division.

As a final note, the Court observes that several of the DOJ documents are sealed court orders and sealed subpoenas. To the extent the sealed court orders and subpoenas are not protected under any other privileges, the Court finds that the confidentiality of these documents should be maintained pursuant to Rule 26(c) until the documents are ordered to be unsealed.

## C. Remaining Claims of Privilege

Part II of this Order focuses primarily on the law enforcement investigatory privilege because the Court believes this privilege is the most appropriate means of protecting the DOJ Documents' confidentiality. In light of the Court's conclusion that the DOJ Documents are protected under the law enforcement investigatory privilege (as well as Rule 26(c)), the Court is not obliged to discuss in detail the Division's remaining three arguments in this Order. A brief analysis of these arguments, however, will provide a more particularized context to the Court's discussion whether Plaintiffs' retention and use of the DOJ Documents constitutes an ethical breach and requires the imposition of sanctions. For this reason, the Court examines briefly the Division's remaining three arguments.[7]

### 1. Federal Rule of Criminal Procedure 6(e)(2)

 Federal Rule of Criminal Procedure 6(e)(2) provides for a "general rule of secrecy" regarding "matters occurring before the grand jury." Fed.R.Crim.P. 6(e)(2). Subject to exceptions not relevant here, Rule 6(e)(2) allows a court to hold in criminal contempt a grand juror, interpreter, stenographer, operator of a recording device, typist transcribing recorded testimony, or attorney for the government who discloses such information. *Id.* "No obligation of secrecy may be imposed on any person except in accordance with this rule." *Id.*

Courts have interpreted Rule 6(e)(2) as expressing a general policy favoring the secrecy of grand jury proceedings, and have required permission from the court and strong showings of need before a party listed in the Rule may disclose matters occurring before the grand jury. *E.g., United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983); *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979).

---

**7.** The Court rejects the Division's bailment theory as a matter of law.

Rule 6(e)(2), however, does not create a privilege to be invoked or waived by the Government, a defendant, or any other party when information makes its way into the hands of private citizens; the Rule simply codifies the obligation of grand jurors and certain government actors to maintain the secrecy of the grand jury proceedings. *United States v. Jeter*, 775 F.2d 670, 675 (6th Cir.1985) ("By its own terms, . . . 'Rule 6(e) applies . . . only to individuals who are privy to the information contained in a sealed document by virtue of their positions in the criminal justice system.' ") (quoting *Worrell Newspapers of Indiana, Inc. v. Westhafer*, 739 F.2d 1219, 1223 (7th Cir.1984), *aff'd*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985)); *Fund for Constitutional Gov't v. National Archives & Records Serv.*, 656 F.2d 856, 870 n. 33 (D.C.Cir.1981) ("Rule 6(e)'s prohibition on disclosure applies only to individuals who have had access to that information by virtue of their relationship to the grand jury investigation or under another provision of the rule."); 1 Charles Alan Wright, Federal Practice & Procedure: Criminal § 106, at 246 (2d ed. 1982) ("No obligation of secrecy can be imposed on any person except those specified in Rule 6(e)(1)."); *Cf.* Diego A. Rotsztain, Note, The Fifth Amendment Privilege Against Self–Incrimination and Fear of Foreign Prosecution, 96 Colum. L.Rev.1940, 1969 (1996) ("if grand jury testimony is divulged, Rule 6(e) provides no *ex post facto* mechanism for a court to rectify the situation").

The Division and Defendants cite a veritable host of case law that, they argue, establishes a requirement of secrecy afforded to grand jury materials even in the hands of private parties. Each one of these cases, however, addresses the release of documents by a party expressly governed by the literal terms of *Rule 6(e)(2)*, such as a government attorney or a grand juror.[8] Not one of the cases cited by the Division and Defendants holds that a private party—whether a newspaper reporter, an attorney, or a disinterested citizen—is obliged under the literal terms of Rule 6(e)(2) to refrain from releasing information when that party, through no affirmative act of his own, comes into possession of grand jury materials.[9]

A primary example of this distinction is Defendants' argument that the disclosure of grand jury materials does not result in a "waiver" of Rule 6(e)(2)'s secrecy provisions. *E.g., United States v. Smith*, 123 F.3d 140, 154 (3d Cir.1997) ("we cannot agree with the newspapers' contention that grand jury material or putative grand jury material, once disclosed, even if inadvertently, is no longer subject to the protections of Rule 6(e)"); *In re North*, 16 F.3d 1234, 1244–45 (D.C.Cir. 1994) ("Rule 6(e) does not create a type of secrecy which is waived once public disclosure occurs") (internal quotation omitted). *Smith* and *North* speak only to the behavior of government attorneys once grand jury material has found its way into the hands of a third party. *Smith*, 123 F.3d at 154 ("At bottom, it is clear to us that a court is simply not powerless, in the face of an unlawful disclosure of grand jury secrets, to prevent all further disclosures *by the government* of those same jury secrets.") (emphasis added); *North*, 16 F.3d at 1245 ("We do not intend to formulate a rule that once a leak of Rule 6(e) material has occurred, *government attorneys* are free to ignore the pre-existing bond of secrecy.") (emphasis added). The cases thus hold only that, even if certain grand jury materials improperly are disclosed to

---

8. The Court also distinguishes an extensive line of case law that assesses whether a witness is precluded by Rule 6(e)(2) from disclosing his or her own testimony before the grand jury. *E.g., Butterworth v. Smith*, 494 U.S. 624, 635, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990) (observing that Rule 6(e)(2) excludes witnesses from its provisions requiring secrecy). These cases are not particularly relevant to this analysis, except insofar as the cases hold that a witness, as a party who is not expressly listed in Rule 6(e)(2), is not bound by the secrecy provisions of Rule 6(e)(2). *Id.*

9. It is true that, if a private party schemes to come into possession of grand jury documents surreptitiously for purposes that foil law enforcement efforts, the private party may be subject to prosecution for obstruction of justice. *Jeter*, 775 F.2d at 675. In a heart-warming display of apparent self-restraint, none of the parties suggests that Plaintiffs' conduct warrants an indictment for obstruction of justice.

the public, *government attorneys and others expressly identified in Rule 6(e)(2)* are not permitted to make further disclosures of these materials unless such disclosures are approved by the court. Applied to this case, *Smith* and *North* simply signify that, despite the fact that the Division inadvertently has disclosed the DOJ Documents to Plaintiffs, *the Division* is not free to disclose the DOJ Documents to Plaintiffs, Defendants, or any other party. *Smith* and *North* say nothing about *Plaintiffs'* obligations under Rule 6(e)(2).

The distinction is not a matter of simply splitting legal hairs. The Court recognizes the need to preserve the secrecy of grand jury proceedings and acknowledges that, given the broad language used in some case law, Defendants raise a valid argument that Rule 6(e)(2) should apply to Plaintiffs and their counsel. *See In re Subpoena to Testify Before Grand Jury*, 864 F.2d 1559, 1562 (11th Cir.1989) (holding that Rule 6(e)(5), which allows court to close grand jury proceedings to public, also permits court to prevent parties and witnesses from disclosing matters before the grand jury). Nonetheless, the only authority known to the Court to address the narrow question presented here suggests that Plaintiffs have no obligations under Rule 6(e)(2) to return the DOJ Documents to the Division. In the absence of authority expressly imposing an obligation upon Plaintiffs to return the documents, and with the availability of a more appropriate doctrine upon which to find the documents are privileged, *see supra* Part II.A., the Court declines to extend the scope of Rule 6(e)(2) to govern the behavior of Plaintiffs' counsel.

### 2. Attorney–Client Privilege

▮▮▮ Stated generally, a client has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications with his or her attorney if:

(1) the communications are between the attorney or the attorney's representative and the client or the client's representative;

(2) the communications are strictly confidential; and

(3) the communications are made in the furtherance of the rendition of legal services to the client or are reasonably necessary for the transmission of the communication.

Supreme Court Std. 503; *see generally* 3 Weinstein's Federal Evidence § 503 (2d ed.1997); 8 J. Wigmore, Evidence § 2292 (McNaughton rev.1961).

When the client is a governmental agency, the attorney-client privilege applies when "the Government is dealing with its attorneys as would any private party seeking advice to protect personal interests and need[ing] the same assurance of confidentiality so it will not be deterred from full and frank communications with its counselors." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 863 (D.C.Cir.1980); *Hollar v. IRS*, No. 95–1882(RMU), 1997 WL 732542, at *3 (D.D.C. Aug. 7, 1997) (invocation of attorney-client privilege by IRS) (unpublished); 24 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure: Evidence § 5475, at 128 (1986) ("Whatever the merits of the arguments for and against the governmental privilege, it seems likely that some form of privilege for governmental clients will be recognized by federal courts . . . .").

The Division's claim of attorney-client privilege, however legitimate in theory, fails in practice. The Division's shortcomings are almost identical to those confronted in *Yang v. Reno*, 157 F.R.D. 625 (M.D.Pa.1994):

> the attorney client privilege must be asserted with respect to each . . . document sought to be withheld, "rather than as a single, blanket assertion." [cits.] . . . Further, the government has alleged no facts supporting the conclusion that . . . DOJ attorneys engaged in attorney-client communications . . . which were both confidential and necessary to enable them to obtain informed legal advice.

157 F.R.D. at 636. In addition, the Court's review of the DOJ documents reveals that only a handful of the documents reflect communications between an attorney and a party who ostensibly could be considered a client, let alone reflect communications that are made in the furtherance of the rendition of legal services to the client.

The Court therefore cannot find that the DOJ Documents are protected pursuant to the attorney-client privilege.

### 3. Deliberative Process Privilege

■ The deliberative process privilege finds its roots in the "common law version of the official information privilege protecting against disclosure of materials that would be injurious to the consultative functions of government." *Branch v. Phillips Petroleum Co.*, 638 F.2d 873, 881 (5th Cir. Unit A March 1981) (internal quotation omitted). The privilege is "applied to shield from disclosure those documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* (internal quotations omitted); *but see generally* 26A Charles Alan Wright & Kenneth W. Graham, Federal Practice & Procedure: Evidence § 5680 (1992) (repudiating "common-law" origins of deliberative process privilege and denouncing the privilege as resting on a "puny instrumental rationale").[10]

■ The Division must meet two prerequisites before it may properly invoke the deliberative process privilege. *Nadler v. United States Dep't of Justice*, 955 F.2d 1479, 1491 (11th Cir.1992). First, the information must be "predecisional," that is, "prepared in order to assist an agency decisionmaker in arriving at his decision." *Id.* (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975)). Second, the information must be "deliberative," playing "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Id.* (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C.Cir.1975)). "[P]urely factual material that does not reflect the agency's deliberative process generally is not protected." *Id.*

Factual material may be withheld only when the factual material "is so inextricably connected to the deliberative material that its disclosure would reveal the agency's decision making processes ... or when it is impossible to segregate in a meaningful way portions of the factual information from the deliberative information." *Id.*

■ Here, the Division asserts a blanket claim that each of the DOJ Documents in Box 108 is so laden with decision-making information that all the information contained in the documents is protected by the privilege. After reviewing the documents, the Court agrees that portions of some of the documents would give rise to a finding that the information is protected under the deliberative process privilege. The same review, however, reveals that minor redactions to many of the documents could eliminate this problem, as pointed out in *Nadler*, 955 F.2d at 1491.

Given the present state of the record, the Court finds that the DOJ Documents are not protected under the deliberative process privilege.

### III. Defendants' Other Requests for Relief

Defendants argue that, because Plaintiffs' retention and use of the DOJ Documents constitute a breach of the ethical rules governing Plaintiffs' counsel, Defendants are entitled to various forms of relief, including: (a) dismissal of Plaintiffs' Complaint; (b) disqualification of Plaintiffs' attorneys who have viewed the DOJ Documents or who have knowledge of the contents of the DOJ Documents; (c) prohibitions against Plaintiffs' use of the information contained in the documents, including striking the deposition of Howard E. Johnson and precluding the depositions of certain other witnesses; and (d) a

---

**10.** As with the law enforcement investigatory privilege, the deliberative process privilege often is applied coterminously with a statutory exemption to the Freedom of Information Act. *E.g., Florida House of Representatives v. United States Dep't of Commerce*, 961 F.2d 941, 944–45 (11th Cir.1992) (applying 5 U.S.C.A. § 552(b)(5)). The judicially-created deliberative process privilege, however, may be applied independently of the FOIA and its exemptions. *E.g., Florida Ass'n of Rehabilitation Facilities, Inc. v. Florida Dep't of Health and Rehabilitative Servs.*, 164 F.R.D. 257, 267 (N.D.Fla.1995) (applying deliberative process privilege in context of discovery dispute in a non-FOIA case); *Sanders v. Alabama State Bar*, 161 F.R.D. 470, 473–74 (M.D.Ala.1995) (same); *see also* 8 Wright & Graham § 5680 (distinguishing FOIA exemption and deliberative process privilege as applied in non-FOIA discovery disputes).

protective order restricting Plaintiffs' further access to the DOJ Documents, and ordering the destruction of any document or record prepared by Plaintiffs that refers to, or contains information from, the DOJ Documents.

### A. Dismissal of Plaintiffs' Complaint

██ Defendants Mohawk and Beaulieu argue that, because Plaintiffs failed to identify the DOJ Documents when responding to Defendants' Interrogatories, the Court must dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 37, or, in the alternative, pursuant to the Court's inherent powers.

With respect to Rule 37, the Eleventh Circuit counsels that, "although [the Rule] confers upon district court judges broad discretion to fashion appropriate sanctions for the violation of discovery orders, [cit.], this discretion is not unbridled." *United States v. Certain Real Property Located at Route 1, Bryant, Alabama,* 126 F.3d 1314, 1317 (11th Cir.1997) (citing *Wouters v. Martin County,* 9 F.3d 924, 933 (11th Cir.1993)). The decision to dismiss a claim or enter default judgment "ought to be a last resort—ordered only if noncompliance with discovery orders is due to willful or bad faith disregard for those orders." *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1556 (11th Cir.1986).

Defendants Mohawk and Beaulieu observe that, although Plaintiffs obtained the DOJ Documents on January 22, 1998, Plaintiffs failed to include the DOJ Documents in the list prepared by Plaintiffs on February 27, 1998, that identifies documents Plaintiffs believed would support their claims. Defendants Mohawk and Beaulieu further argue that Plaintiffs failed to supplement this list to include the DOJ Documents, even after the Court issued an Order on May 22, 1998, directing Plaintiffs to file a more detailed list.

Defendants Mohawk and Beaulieu's argument has no merit. Plaintiffs had objected to providing an exhaustive list of all documents they believed would support their claims on the ground that Defendants had propounded "contention interrogatories." Consequently, Plaintiffs had no obligation to provide exhaustive answers to Defendants' Interrogatories until May 22, 1998, when the Court issued an Order ruling on Plaintiffs' objections. At that time, the Court recognized that Plaintiffs likely could not identify immediately all the documents that would support their claims, and therefore ordered Plaintiffs to use their best efforts to provide more detailed answers to the Interrogatories as discovery proceeded.

In sum, although Plaintiffs *could* have identified the DOJ Documents in a supplemental answer to Defendants' Interrogatories, Plaintiffs' failure to do so does not flout an express order of the Court—or any other legal obligation—to such an extent that Plaintiffs have exhibited bad faith or a willful disregard of the Court's authority. Dismissal pursuant to Rule 37 therefore is inappropriate.

██ Defendant Beaulieu also posits that the Court should dismiss this action pursuant to the Court's inherent authority. "[D]eeply rooted in the common law tradition is the power of any court to 'manage its affairs [which] necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it.'" *Malautea v. Suzuki Motor Co., Ltd.,* 987 F.2d 1536, 1545 (11th Cir.1993) (quoting *Carlucci v. Piper Aircraft Corp.,* 775 F.2d 1440, 1447 (11th Cir.1985)). "A court may appropriately sanction a party or attorney who shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order. However, because a court's inherent powers are so potent, they must be exercised with restraint and discretion." *Id.* (internal quotations and citations omitted). Here, to the extent that the Court possesses the inherent authority to dismiss a case under *Malautea,* the Court declines to exercise this authority for the same reasons that the Court declines to dismiss the case pursuant to Rule 37.

### B. Disqualification of Plaintiffs' Counsel

██ Defendants argue that Plaintiffs' use of the inadvertently-produced DOJ Documents constitutes a breach of the ethical obligations governing Plaintiffs' counsel, and confers upon Plaintiffs an irremediable litiga-

tion advantage because Defendants are not privy to the contents of the documents. Defendants therefore seek disqualification of Plaintiffs' counsel.

The ethical conduct of all members of the Bar of this Court is governed by the Code of Professional Responsibility and the Standards of Conduct contained in the Rules and Regulations of the State Bar of Georgia. L.R. N.D.Ga. 83.1.C. The Georgia State Bar has adopted the American Bar Association's Model Code of Professional Conduct, which provides that "a lawyer should avoid even the appearance of impropriety." Ga.Code Prof. Resp., Canon 9. This language has given rise to a two-part test for assessing a motion to disqualify a Georgia lawyer based upon an alleged ethical violation. *Norton v. Tallahassee Memorial Hosp.*, 689 F.2d 938, 941 (11th Cir.1982) (citing *United States v. Hobson*, 672 F.2d 825 (11th Cir.1982)); *Metrahealth Ins. Co. v. Anclote Psychiatric Hosp., Ltd.*, 961 F.Supp. 1580, 1583 (M.D.Fla.1997). First, "there must be at least a reasonable possibility that some specifically identifiable impropriety did occur," even if no evidence exists of actual wrongdoing. *Hobson*, 672 F.2d at 828. Second, the "likelihood of public suspicion or obloquy [must] outweigh the social interest that would be served by a lawyer's continued participation in a particular case." *Id.*

Since the publication of *Hobson*, the ABA has replaced the Model Code of Professional Conduct with the Model Rules of Professional Conduct. The Model Rules omit any reference to a lawyer's obligation to "avoid even the appearance of impropriety" as mandated in Canon 9. *Nuri v. PRC, Inc.*, 5 F.Supp.2d 1299, 1302–03 (M.D.Ala.1998). Nonetheless, the Georgia Bar and the Northern District of Georgia both have elected to retain the ethical rules set forth in the Model Code, so the Court will continue to apply *Hobson's* test for disqualification as adopted under the provisions of the Model Code. *Cox v. American Cast Iron Pipe Co.*, 847 F.2d 725, 729 n. 5 (11th Cir.1988) (applying *Hobson's* standard for disqualification for alleged ethical violation despite the ABA's adoption of Model Rules, because Alabama's Code of Professional Responsibility retained Model Code);

*United States v. Martin*, 824 F.Supp. 208, 210–211 (M.D.Ga.1993) (using *Hobson's* standard because Georgia Code of Professional Responsibility retained Model Code).

**1. Reasonable Possibility that Plaintiffs' Counsel Violated a Specifically Identifiable Ethical Rule**

In order to satisfy the first part of the *Hobson* test, a reasonable possibility must exist that the retention and use by Plaintiffs' counsel of inadvertently-produced confidential documents violates a specifically identifiable ethical rule. The Georgia Code of Professional Responsibility contains no specific rule governing this conduct. Defendants point instead to Formal Opinion 92–368 of the ABA's Committee on Ethics and Professional Responsibility ("Opinion 92–368"), which states that, under the Model Rules:

[a] lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them.

(Opinion 92–368, at 1.)

No court in the Eleventh Circuit or Georgia has adopted Opinion 92–368, and no Eleventh Circuit authority commands district courts to follow the ABA Committee's Formal Opinions as binding precedent. Of course, even in the absence of such authority, the Court is free to apply Opinion 92–368's reasoning to this case if the Court finds that the law and policies underlying Opinion 92–368 are sound and are consistent with the legal precedent governing the conduct of lawyers practicing before this Court.

An attorney's obligations after receiving inadvertently disclosed confidential documents, however, is not a matter of settled law in the Eleventh Circuit or the Northern District of Georgia. Although the prevailing view of district courts in this circuit is to employ a balancing test to determine if a party has waived claims of privilege for inadvertently produced documents, at least one court in the Northern District of Georgia

holds that an inadvertent disclosure of documents constitutes a *per se* waiver of any privileges associated with the documents. *Bellsouth Adver. & Publ'g Corp. v. American Business Lists, Inc.*, No. 1:90–CV–149–JEC, 1992 WL 338392, at *8 (N.D.Ga. Sept. 8, 1992) (holding that inadvertent disclosure of documents constitutes a *per se* waiver of the attorney-client privilege) (citing *In re Sealed Case*, 877 F.2d 976, 980 (D.C.Cir.1989)) (unpublished). The issue has not been resolved by the Eleventh Circuit. *Briggs & Stratton Corp. v. Concrete Sales & Servs.*, 176 F.R.D. 695, 699 (M.D.Ga.1997). Plaintiffs therefore may raise a legitimate argument that the inadvertent disclosure of the DOJ Documents constitutes a *per se* waiver of any privileges—a rule that is flatly inconsistent with the rule adopted in Opinion 92–368. *In re United Mine Workers of Am. Employee Ben. Plans Litig.*, 156 F.R.D. 507, 511 (D.D.C.1994) (holding that, because the D.C. Circuit employs a *per se* waiver rule, the district court is compelled to ignore Opinion 92–368). Given the lack of a definitive rule governing the waiver issue at the time of Plaintiffs' counsel's conduct, the Court cannot conclude that Opinion 92–368 establishes an ethical rule governing lawyers practicing in this Court when they receive inadvertently produced documents.

Furthermore, Opinion 92–368 is not universally accepted among legal ethics experts. The American Law Institute's Proposed Restatement of the Law Governing Lawyers opines that Opinion 92–368 "is not supported by decisional law," and instead proposes that, when a lawyer receives documents and cannot reasonably conclude that the transmission was authorized:

> the receiving lawyer's responsibilities depend on the circumstances. If the disclosure operates to end legal protection for the information, the lawyer may use it for the benefit of the lawyer's own client and may be required to do so if that would

advance the client's lawful objectives [cit.]. [This result may occur] ... when divulgence occurs inadvertently outside of the court.

Restatement of the Law Governing Lawyers § 112, cmt. m & note (Proposed Final Draft No. 1, 1996).[11]

The Court therefore concludes that, although Opinion 92–368 represents one view regarding an attorney's obligation to return inadvertently produced documents, it is debatable whether Opinion 92–368 establishes an ethical rule that governs the conduct of attorneys in this circuit. A court should be hesitant to "deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct." *Schlumberger Tachnologies, Inc. v. Wiley*, 113 F.3d 1553, 1560–61 (11th Cir. 1997) (internal quotations omitted).[12] Here, a responsible attorney could argue that, following the rule adopted in *Bellsouth Advertising*, the Division's inadvertent disclosure constituted a *per se* waiver of any privileges associated with the documents, and Opinion 92–368 does not apply. A responsible attorney also could argue that Opinion 92–368 is based on flawed reasoning. The Court therefore finds that Opinion 92–368 does not create a reasonable possibility that Plaintiffs' counsel violated a specifically identifiable ethical rule, and disqualification is not appropriate under these circumstances.

Defendants also argue that the retention and use of the DOJ Documents by Plaintiffs' counsel contravenes the secrecy provisions for grand jury proceedings set forth in Federal Rule of Criminal Procedure 6(e)(2), thus creating a reasonable possibility that Plaintiffs' counsel's conduct violated an ethical rule. The Court disagrees. As discussed *supra* Part II.C.1., no authority extends the

---

11. The American Law Institute has approved the Proposed Restatement and will release the final Restatement after a final edit. (Pls.' Resp. in Opp. to Mots. for Dismissal and Disqualification Ex. A ¶ 3.)

12. The narrow holding in *Schlumberger* addresses a court's ability to disqualify an attorney who

is applying, or who has applied, for admission *pro hac vice* based on the attorney's pre-trial conduct. 113 F.3d at 1561. The portion of the opinion cited by the Court in this Order constitutes dictum of sufficient persuasive value to apply in the context before the Court as well.

secrecy requirements contained in Rule 6(e)(2) to private actors who inadvertently come into possession of grand jury materials. A responsible attorney therefore could legitimately argue that Rule 6(e)(2) does not govern the conduct of Plaintiffs' counsel. Under such circumstances, the Court cannot find that a reasonable possibility exists that Plaintiffs' counsel violated a specifically identifiable ethical rule.

### 2. Likelihood of Public Suspicion and Obloquy and Social Interests in Continued Representation

The second part of the *Hobson* test requires the Court to balance the likelihood that Plaintiffs' counsel's conduct will generate distaste or outrage among the public against the social interests to be served by the continued participation of Plaintiffs' counsel in this case.

Here, the Court places significant emphasis on the tremendous social costs that would be imposed by disqualifying Plaintiffs' counsel. This case has consumed three years of the parties' and the Court's time, and a staggering amount of public and private resources have been expended simply to reach this stage of the litigation. The disqualification of Plaintiffs' counsel would impose a severe hardship upon Plaintiffs and this Court in accomplishing an expedited resolution of this case.

Balanced against these tremendous social costs is a minimal risk that the public would view the conduct of Plaintiffs' counsel with distaste or outrage. This is not a case where Plaintiffs' counsel affirmatively endeavored to subvert the judicial process. Rather, Plaintiffs' counsel took advantage of documents given to them by one of their adversaries, and such conduct is not likely to engender widespread disapprobation among the public.

The Court therefore concludes that, even if a reasonable possibility existed that Plaintiffs' counsel violated a specifically identifiable ethical rule, the social costs imposed by disqualification would outweigh any enhancements to the public's confidence in the legal system.

### 3. Summary

For the reasons set forth above, the Court concludes that, under the circumstances of this case, disqualification of Plaintiffs' counsel is inappropriate.

### C. Prohibitions Against Plaintiffs' Use of Information

 Defendants argue that, because Plaintiffs have had unilateral access to the confidential information contained in the DOJ Documents, the Court must restrict Plaintiffs from using or relying upon the information in any way. Defendants further request that the Court strike the deposition of Howard E. Johnson, during which Plaintiffs relied upon one of the DOJ Documents, and preclude Plaintiffs from deposing other witnesses whom Plaintiffs allegedly identified solely through information obtained from the DOJ Documents.

The Court possesses the authority to take such actions pursuant to its inherent powers to manage discovery, as well as its discretion to award protective orders conferred by Federal Rule of Civil Procedure 26(c). *Degen v. United States*, 517 U.S. 820, 826, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996) ("the District Court has its usual authority to manage discovery in a civil suit, including the power to enter protective orders limiting discovery as the interests of justice require") (citing Fed. Rule Civ. P. 26(c)); *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1545 (11th Cir. 1993) ("[D]eeply rooted in the common law tradition is the power of any court to manage its affairs [which] necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it. A court may appropriately sanction a party or attorney who shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.") (internal quotation and citation omitted). The Court therefore must decide whether the conduct of Plaintiffs' attorneys in retaining and using the DOJ Documents warrants the sanctions proposed by Defendants.

As the Court stated *supra* Part III.B., the conduct of Plaintiffs' counsel does not create a reasonable likelihood that Plaintiffs' coun-

sel violated an ethical rule. Rather, it appears that Plaintiffs' counsel recognized the unusual nature of the DOJ Documents and, after performing some thorough legal research, concluded that the ethical rules permitted them to retain and use the documents. The Court agrees that, as a purely legal matter, this conclusion falls within the parameters of legitimate legal theory.

This says nothing, however, about the *professional* obligations of Plaintiffs' counsel in these circumstances. Plaintiffs' counsel are not inexperienced lawyers; they should have anticipated that the retention and use of the DOJ Documents seriously would complicate this litigation and potentially compromise federal law enforcement efforts. For the Court to list the courses of action that would have been more appropriate than the course selected by Plaintiffs' counsel would take more pages than the Court is willing to spare, but the most obvious course should have been for Plaintiffs' counsel to set the DOJ Documents aside, notify the Court and all interested parties, and raise the same. arguments that are raised here while discovery continued. Instead, solely because Plaintiffs' counsel exercised poor judgment, this already venerable case has matured several more months and unnecessarily consumed the time and resources of the Court and the parties.

What is more, Plaintiffs now possess information that will not be shared with Defendants, thus conferring upon Plaintiffs an advantage in this litigation. The Court's review of the DOJ Documents reveals that this advantage, while tangible, is not as monumental as Defendants suggest. Only a handful of the DOJ Documents addresses antitrust issues, and an even smaller percentage contains evidence that arguably is probative to Plaintiffs' claims. Given Plaintiffs' need to establish anticompetitive behavior on a class-wide basis, the evidence contained in the DOJ Documents assumes

little importance compared to Plaintiffs' assemblage of pricing data.

Finally, the Court observes that Plaintiffs are not the only ones whose conduct has contributed in some manner to this fiasco. Defendant Shaw expressly decided not to review the documents returned by the Antitrust Grand Jury before making them available to Plaintiffs.[13] In other words, Defendant Shaw took a calculated risk that the costs to review the documents substantially outweighed the possibility that confidential materials had been inadvertently intermingled with the documents. Defendant Shaw therefore cannot be heard to complain that this risk became reality.

Defendants Beaulieu and Mohawk, however, are faced with a disadvantage that occurred through no fault of their own. Under these circumstances, the Court concludes that the lapse in professional judgment by Plaintiffs' counsel has prejudiced these Defendants and unnecessarily interfered with the expeditious resolution of this case. The Court therefore strikes the April 24, 1998, deposition of Howard E. Johnson, during which Plaintiffs used one of the DOJ Documents as an exhibit. Furthermore, Plaintiffs may not take any further depositions of Johnson, may not use his testimony in any way during the remainder of these proceedings, and may not call Johnson as a witness at trial.

The Court will not order the thirty-five attorneys for Plaintiffs who had access to the DOJ Documents to refrain from any further use of information gleaned from the documents. Certainly, Plaintiffs' counsel has a professional obligation to refrain from sharing this information with any of the remaining lawyers who have not been informed about the contents of the documents. The Court, however, simply does not possess the resources to resolve the inevitable onslaught

---

13. The Court also observes that, although Defendant Shaw represented to the Division that Defendant Shaw had reviewed the returned Antitrust Grand Jury documents after the Division inadvertently sent internal documents to Defendant Shaw in November 1997, (Def. Shaw's Br. in Supp. of the Return of Documents Ex. B ("Because of our discovery of that file we at-

tempted to review the remaining files to ensure that they were free of internal Justice Department documents. Apparently we missed this particular document.")), Defendant Shaw now informs the Court that it undertook no review of the returned Antitrust Grand Jury documents until after the Johnson deposition in late April 1998.

of objections and motions by Defendants every time Defendants are touched by a suspicion that Plaintiffs are using this information.

The Court similarly declines Defendants' request to preclude Plaintiffs from deposing other witnesses who allegedly have been identified through the DOJ Documents. Defendants offer only speculation that Plaintiffs' intent to depose the witnesses arose only after learning their identities in the DOJ Documents.

In summary, the Court will restrict Plaintiffs from further deposing Howard E. Johnson or using his existing testimony in any way, and will restrict Plaintiffs from calling Johnson as a witness at trial. The Court will decline the remainder of Defendants' requests to preclude Plaintiffs from using the information obtained from the DOJ Documents.

### D. Protective Order Safeguarding the Confidentiality of the DOJ Documents

 Lastly, Defendants and the Division seek a protective order restricting Plaintiffs' further access to the DOJ Documents, and ordering the destruction of any document or record prepared by Plaintiffs that refers to, or contains information from, the DOJ Documents.

The Court has concluded in this Order that the confidentiality of the DOJ Documents must be protected under the law enforcement investigatory privilege and Federal Rule of Civil Procedure 26(c). *See supra* Parts II.A. & II.B. The Division therefore is entitled to a protective order restricting Plaintiffs' further access to the documents. Furthermore, to the extent Plaintiffs have not done so, Plaintiffs must destroy or delete any references to information gained from the DOJ Documents, including references in Plaintiffs' own internal memoranda and information entered into Plaintiffs' electronic databases.

### IV. Defendant Beaulieu of America's Motion to Strike Declaration of Charles W. Wolfram

Defendant Beaulieu requests that the Court strike the Declaration of Charles W. Wolfram, which Plaintiffs filed in conjunction with their Response in Opposition to Motions for Dismissal and Disqualification.

In reaching the conclusions set forth in this Order, the Court had no occasion to rely upon any of the opinions in the Wolfram Declaration, except for the statement that the American Law Institute has approved the final draft of the Restatement of Law Governing Lawyers. (*See supra* note 10.) The Declaration therefore need not be stricken from the record, as the single portion of the Declaration relied upon by the Court is admissible evidence.

### V. Conclusion

Let the Court be perfectly clear: all the parties now know that the Court will apply a balancing test to determine if an inadvertent disclosure of documents waives any privileges associated with the documents, and that a party has a professional obligation to notify the Court and its adversaries if it comes into possession of such documents. If any party now is in the possession of documents that belong to another party and arguably are privileged or otherwise confidential, or if any party comes into possession of such documents throughout the remainder of this case, failure to notify the Court immediately will result in the most severe of sanctions.

In closing, the Court feels compelled to voice its disappointment concerning the events of the past two months. The parties know well the obligation the Court has in managing this case to a swift and judicious resolution, and the Court has endeavored to fulfill this obligation, often at the expense of its already-full docket. This episode represents an unnecessary obstruction in the Court's discharge of its obligations. Now that this episode has come and passed, the Court will impose upon the parties the strictest of commitments to complete discovery and any pretrial motions expeditiously; the Court will not hesitate to assign fault to any party that impedes with this commitment.

With respect to the episode itself, enough mud has been slung by the parties themselves regarding the lapses of judgment by the responsible entities, so the Court will not

unnecessarily join this affray. The Court simply observes that, although certain entities have seized the opportunity to howl about the ethical transgressions of others while celebrating their own saintly behavior, there are precious few white horses tied up outside the courthouse.

ACCORDINGLY, the Court **GRANTS** Defendant Shaw Industries' Motion for Protective Order [177] to the extent set forth in this Order, **GRANTS IN PART** and **DENIES IN PART** Defendants Beaulieu of America and Conquest Carpet Mills' Motion for Protective Order [178] to the extent set forth in this Order, **GRANTS** Defendant Shaw Industries' Motion for the Return of Documents [184], **GRANTS IN PART** and **DENIES IN PART** Defendant Beaulieu of America's Motion to Dismiss Plaintiffs' Complaint, for Protective Order, and for Disqualification of Counsel [186] to the extent set forth in this Order, **GRANTS** Plaintiffs' Motion to Exceed Page Limitations [192], **GRANTS** Plaintiffs' Motion to Exceed Page Limitations [198], and **DENIES AS MOOT** Defendant Beaulieu of America's Motion to Strike Declaration of Charles W. Wolfram [204].